IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

GEOFFREY D. DUKE,
    Plaintiff,

vs.                                          Case No. 3:09cv412/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
    Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge under the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D), and 72.3 of the Northern District of Florida pertaining to review of administrative determinations under the Social Security Act ("the Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of the Social Security Administration ("the Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record, this court concludes that the Commissioner's final determination is supported by substantial record evidence and is the result of the application of proper legal principles. The court therefore recommends that the decision of the Commissioner be affirmed.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed his DIB application on November 12, 2004, alleging disability beginning February 22, 2001 (*see* Tr. 391).[1] The application was denied initially and on reconsideration (*see* Tr. 74–75). On September March 14, 2007, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not disabled (Tr. 391–99), but the Appeals Council later remanded Plaintiff's case for new hearing and decision (Tr. 404–06). On December 8, 2008, after additional hearings, a different ALJ issued a decision in which he found that Plaintiff had not been disabled at any time through his date last insured ("DLI")[2] (Tr. 15–26). On July 9, 2009, the Appeals Council denied Plaintiff's request for review (Tr. 7–9). Thus, the December 8, 2008, decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

II.     FINDINGS OF THE ALJ

In his decision denying Plaintiff's application for DIB, the ALJ made the following findings:

1)    Plaintiff last met the insured status requirements of the Act on December 31, 2006, his DLI.

2)    Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of February 22, 2001, through December 31, 2006.

3)    Through his DLI, Plaintiff had the following severe impairments: cervical and lumbar disc disease, degenerative joint disease, and morbid obesity.

4)    Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.

---

[1] All references to "Tr." refer to the transcript and page numbers of the Social Security Administration record filed on November 20, 2009 (Doc. 6).

[2] To be eligible to receive DIB, a claimant must show he became disabled prior to the expiration of his date last insured. *See* 20 C.F.R. §§ 404.130, 404.131; Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).

Case No. 3:09cv412/MCR/EMT

5) Plaintiff had the residual functional capacity ("RFC") to perform light exertional work, with certain restrictions.[3]

6) Plaintiff was unable to perform his past relevant work.

7) Plaintiff was born on December 22, 1957, and thus on his DLI was forty-nine years of age, which is defined as a younger individual.

8) Plaintiff has at least a high school education and is able to communicate in English.

9) Transferability of jobs skills is not material to the determination of disability because the Medical-Vocational Guidelines, used as a framework for decisionmaking, support a finding that Plaintiff was not disabled prior to his DLI, regardless of transferable job skills.

10) Based on Plaintiff's age, education, work experience, and RFC to perform a limited range of light work, and the testimony of a vocational expert ("VE"), Plaintiff was able to perform the jobs of outside deliverer, electrical accessories assembler, and mail clerk.

11) Plaintiff was not under a disability at any time from February 22, 2001, his alleged onset date, through December 31, 2006, his DLI.

III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("this Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983),

---

[3] During the period relevant to his instant DIB claim, Plaintiff was limited to standing and walking for a total of two hours during an eight-hour workday. He was limited in the ability to use his lower extremities for pushing and pulling. He could not climb or crawl. He could occasionally balance, kneel, crouch, and stoop, and he had an unlimited ability to sit. He had no manipulative, visual, communicative, or environmental limitations.

*superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months,

and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

  4.  If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

  5.  Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

  The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV. PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY[4]

  A.  Personal and Employment History

  Plaintiff completed the twelfth grade and two years of college (Tr. 140; 523). He also received vocational training as a merchant marine and obtained a captain's license for the off-shore oil and gas industry (Tr. 21; 24; 135; 140; 523). Plaintiff was employed as a boat captain for twenty years (Tr. 524). At the time of the November 2008 hearing Plaintiff's weight was approximately 330 pounds; he also testified that he was about six feet in height and that his normal weight was about 300 pounds (Tr. 524).

---

[4] The information in this section is taken from the opinion of ALJ as well as from references to the record made both by Plaintiff and the Commissioner in their memoranda.

B. Relevant Medical History[5]

Plaintiff received primary health care at the Family Practice Center in Metairie, Louisiana, starting in March 2001 for hypertension, lower back pain, and paresthesias (Tr. 323–73).[6] In April 2001, MRIs of Plaintiff's lumber and cervical spine were taken (Tr. 186; 217–21). The lumber spine MRI showed generalized and advanced degenerative disc disease, most pronounced at the L4-5 and L5-S1 levels, as well as marked bilateral foraminal stenosis at L5-S1 and moderate stenosis of the central canal at L4-5 (Tr. 221). The MRI of the cervical spine revealed "moderately impressive" right posterior and posterolateral disc herniation at C5-6 and "lesser broadly based" herniation at C6-7 (Tr. 218). Plaintiff's treating physician, Robert A. Steiner, M.D., opined that Plaintiff's symptoms appeared cervical in nature rather than lumbar, and he recommended a neurological consult (Tr. 213).

Neurologist Lucien S. Miranne, M.D., examined Plaintiff on April 25, 2001 (Tr. 299–300).[7] Dr. Miranne's impression was cervical myelopathy secondary to cord compression at C5-6 and, to a lesser degree, at C6-7 (Tr. 299). Dr. Miranne recommended an anterior cervical discectomy and fusion for cord compression (*id.*), which he performed May 1, 2001 (Tr. 526). In a chart note dated May 11, 2001, Dr. Miranne reported that Plaintiff's post-operative course was satisfactory and his myelopathic symptoms had improved; according to Dr. Miranne, "[n]umbness, tingling and weakness in extremities, all considerably better." (Tr. 297). Reports of subsequent follow-up visits through the end of 2001 likewise reflect that Plaintiff was doing well (Tr. 292–96). In February 2002

---

[5] The administrative record in this case is 545 pages, of which approximately 250 pages are medical records from numerous health care providers. As discussed below, Plaintiff restricts his claims of error to two issues. In support of his arguments Plaintiff cites very limited or nonspecific portions of the records of two treating physicians and one examining physician (indeed, with respect to one of the treating physicians, Lucien S. Miranne, M.D., Plaintiff miscites the appropriate page numbers); Plaintiff also refers to the reports of two magnetic resonance imaging ("MRI") tests. Given Plaintiff's reliance on such a limited portion of the medical evidence, in the outline that follows the court has found it unnecessary to provide a detailed summary of the entire record. Rather, the court restricts its outline to the evidence cited by Plaintiff and the Commissioner, as well as any other evidence the court has determined is relevant to the resolution of this appeal.

[6] Plaintiff continued to be treated at the Family Practice Center through December 2005 (Tr. 323; 372).

[7] Plaintiff does not cite specific pages of Dr. Miranne's records but rather only identifies them generally as "T. 212-34." Dr. Miranne's records in fact are not found at pages 212 through 234 of the administrative file but rather at pages 274–309.

Case No. 3:09cv412/MCR/EMT

Dr. Miranne noted that, status post surgery, Plaintiff's condition was "[o]verall much improved with almost complete resolution of most of his myelopathic findings. His motor weakness has resolved. Lumber spondylosis." (Tr. 291). Dr. Miranne saw Plaintiff again in April 2002, when he reported that Plaintiff's cervical myelopathy had improved. Dr. Miranne also noted that Plaintiff had lumbar spondylosis with no severe symptomatology currently (Tr. 290). Dr. Miranne opined that Plaintiff "should not go back to working on boats at this time as he was before. I feel that he would only be capable of very light or sedentary type work at this point." (*Id.*). In June 2002, Dr. Miranne reported that Plaintiff's neck and arm symptomatology and myelopathy had improved markedly, although Plaintiff's lumbar symptomatology seemed worse (Tr. 289). A repeat lumbar MRI and films were recommended and revealed multilevel stenosis at L2-3 (Tr. 288). In October 2002 Dr. Miranne noted that Plaintiff's cervical myelopathy had cleared but that he was continuing to experience symptoms in his lower extremities, probably related to his lumbar spondylosis (Tr. 285).

In January 2003 Dr. Miranne noted that radiographs of the lumbar spine showed no subluxation, normal alignment, and moderate spondylitic changes (Tr. 282). An MRI of the lumbar spine revealed moderate to severe spondylitic changes at L2-3 (right), L3-4 (central), L4-5 (bilateral), and L5-S1 (bilateral) (*id.*). Dr. Miranne advised Plaintiff to lose weight and exercise; facet injections were also considered. Dr. Miranne opined that Plaintiff was not "capable of any further work as he has done in the past." (*id.*). In April 2003 Dr. Miranne noted that Plaintiff's cervical radiculopathy and myelopathy had cleared though he had intermittent arthritic neck pain, that his lumbar spondylosis was non-radicular at that time, and that he suffered from probable clinical depression due to being unable to work (Tr. 281). In July 2003 Dr. Miranne reported that Plaintiff's cervical radiculopathy and myelopathy had essentially resolved and that he had lumbar spondylosis, primarily non-radicular (Tr. 280). Dr. Miranne's October 2003 office visit report was similar (Tr. 279).

In February 2004 Dr. Miranne noted that Plaintiff's cervical symptomatology had resolved and that he had persistent non-radicular low back pain associated with lumbar spondylosis. On physical examination, Dr. Miranne found good range of motion of the cervical spine, slight numbness in the upper left extremity, slight restriction in flexion of the lumbar spine, no point tenderness, no spasm, negative straight leg raise, negative bowstring sign, normal motor strength

throughout, and normal deep tendon reflexes (Tr. 278). In May 2004 Dr. Miranne again reported that Plaintiff's cervical symptoms were resolved, but that he persisted with non-radicular lower back pain (Tr. 277); the results of a physical examination were similar to those reported in February 2004. Dr. Miranne reported in September 2004 that Plaintiff's cervical radiculopathy and myelopathy remained resolved. He noted that Plaintiff's lumbar spondylitic radiculopathy was stable and "not severe at this point." (Tr. 276). In November 2004 pain management specialist David Shawa, M.D., prescribed a narcotic pain medication, MS-Contin, for Plaintiff, as well a muscle relaxant (Tr. 322).

Plaintiff's next reported visit to Dr. Miranne was in January 2005 (Tr. 275). Dr. Miranne stated that Plaintiff had done well following his May 2001 cervical surgery, with symptoms markedly improved and residual effects mild and stable (*id.*). Dr. Miranne also noted that Plaintiff suffered from lumbar spondylitic stenosis with intermittent back and right leg pain. At that time, Plaintiff reported "only slight tightness in the back and right leg with no frank radiculopathy" (*id.*). Physical examination was essentially normal (*id.*). Dr. Miranne's impression was that Plaintiff's radiculopathy and myelopathy of the upper extremities had resolved and that his lumbar spondylosis was not severe at that time (*id.*). In April 2005 Dr. Miranne examined Plaintiff and noted in a questionnaire that Plaintiff had some swelling of the neck and lower back, but his grip strength was normal, his manual dexterity was intact, and his gait was normal (Tr. 274). Also in April 2005, Dr. Shawa again prescribed MS-Contin and a muscle relaxant for Plaintiff (Tr. 320). In June 2005 Dr. Shawa noted Plaintiff's diagnoses of lumbar degenerative disc disease, lumbar facet arthropathy, and lumbar discogenic pain; he offered to refill Plaintiff's MS-Contin prescription and change Plaintiff's muscle relaxant, after Plaintiff first submitted to a urine test, but Plaintiff left the office before providing a urine sample (Tr. 319). Plaintiff returned to Dr. Shawa's office a few weeks later. Dr. Shawa refilled Plaintiff's muscle relaxant at that time and wrote him a prescription for a non-narcotic pain medication (Tr. 318). On physical examination, Dr. Shawa noted no tenderness to palpation of the lumbar spine, normal reflexes, 4/5 strength assessment of the right foot, normal gait, and the inability to heel-walk (*id.*).

The medical evidence also includes records from Rogelio Samson, M.D., from November 2007 to September 2008 (Tr. 452–74). In November 2007 Dr. Samson saw Plaintiff for left knee

pain (Tr. 466–67). Among other findings, Dr. Samson noted that back pain was not present and that there was full range of motion in all joints. In December 2007 Plaintiff complained of knee pain, lower back pain, and neck pain (Tr. 463). Dr. Samson noted painful movements, tenderness in the lower back, and the presence of a large-bone like lesion on the left knee (Tr. 464). Plaintiff reported flare-ups of chronic pain in his neck, lower back, and left knee during a March 2008 visit (Tr. 460), and Dr. Samson noted on physical examination that Plaintiff exhibited localized muscle tenderness of the cervical spine, painful movements, and tenderness in the lower back (Tr. 461). A June 2008 examination was similar (Tr. 457). In September 2008 Plaintiff reported foot pain and intermittent, recurrent neck and lower back pain, moderate in degree, that currently was stable (Tr. 454). On physical examination, Dr. Samson noted localized muscle tenderness, painful movements, and tenderness over the left knee and in the left foot (Tr. 455). Dr. Samson's assessments included degenerative joint disease, neck pain, gout, hypertension, and obesity (Tr. 455–56).

V.     OPINIONS OF EXAMINING PHYSICIANS

Plaintiff presented to orthopedic surgeon Leo Chen, M.D., in September 2006 for a consultative examination (Tr. 378–86). Dr. Chen reported that Plaintiff's complaints regarding his cervical condition were "minimal" (Tr. 378). With respect to his lumbar spine condition, Plaintiff described leg pain (left leg worse than right) and pain and numbness in the left leg (*id.*). Plaintiff stated that he required no assistive device to ambulate and that he continued to drive. Dr. Chen noted that radiographs of the lumbar spine revealed moderate degenerative changes at L4-5 and L5-S1, with spurring and narrowing of the disc spaces at these levels (*id.*). Plaintiff appeared to be well-developed, well-nourished, and in no acute distress. A range of motion examination revealed some limitation of the neck and back, but full range of motion of the extremities (Tr. 379). Plaintiff's sensation was grossly intact; his deep tendon reflexes were symmetrical; he could toe, heel, and tandem walk; and he had no significant spasm of his lumbar spine. There was some numbness of both legs. Dr. Chen assessed lower back pain, lumbar spondylosis, and history of cervical myelopathy status post anterior cervical discectomy and fusion (*id.*). Dr. Chen opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk at least two hours in an eight-hour workday; and could sit without limitation (Tr. 383–84). Plaintiff

was limited in the ability to push or pull with his legs (Tr. 384). He could occasionally balance, kneel, crouch, and stoop, but he could never climb or crawl (*id.*). According to Dr. Chen, while Plaintiff had no manipulative, environmental, or visual/communicative limitations, he "would have some restriction of his physical activity." (Tr. 379).

In February 2008 Richard W. Lucey, M.D., conducted a consultative examination of Plaintiff (Tr. 433–35). Dr. Lucey assessed Plaintiff with degenerative disc disease of the lumbar spine and associated degenerative changes in the facets with the possibility of canal stenosis; multilevel cervical degenerative disc disease, status post anterior cervical discectomy and fusion; and history of recurrent knee pain (*id.*). Dr. Lucey opined that, based on Plaintiff's lumbar spine conditions, Plaintiff could lift and carry twenty pounds occasionally and up to ten pounds frequently (Tr. 438). He could sit two hours at a time, for a total of four hours in an eight-hour workday, and he could stand and walk for one hour at a time each, for a total of two hours each in an eight-hour workday (Tr. 439). Plaintiff could occasionally push/pull, frequently reach overhead, and continuously reach in all other directions, handle, finger, and feel (Tr. 440). He could operate foot controls frequently. Plaintiff could occasionally stoop, kneel, crouch, and climb ramps and stairs, and he could continuously operate a motor vehicle. He could never balance, crawl, work at unprotected heights or with moving mechanical parts, climb ladders or scaffolds, or work in extreme heat or cold (Tr. 441–42).

David Fisher, M.D., completed an RFC assessment and pain assessment of Plaintiff on August 21, 2008 (Tr. 444–48). In his RFC assessment Dr. Fisher opined that Plaintiff could sit for as long as one hour at a time, for a total of three hours in an eight-hour workday; could stand/walk for up to an hour at a time, for a total of three hours in an eight-hour work day; and would need to rest, lie down, or recline for one to two hours in an eight-hour workday (Tr. 445). Plaintiff was limited to lifting and carrying ten pounds occasionally and up to five pounds frequently; could use his hands for simple grasping and fine manipulation but not pushing/pulling; and could not use his feet for repetitive motions (Tr. 446). Plaintiff could occasionally bend, squat, crawl, and reach but never climb (*id.*). He was completely restricted from being around moving machinery and unprotected heights, and he was moderately restricted from driving automotive equipment and

exposure to dust, etc. When asked if Plaintiff took any medications that would interfere with his ability to work, Dr. Fisher checked neither "yes" nor "no" in the boxes provided, but he listed several medications whose side effects included "lethargy, confusion, dizziness, disorientation, [and] imbalance" (*id.*). In response to a question asking if the above limitations had lasted or could be expected to last for twelve continuous months or longer and another question asking if any pain alleged by Plaintiff was consistent with his clinical findings, Dr. Fisher indicated "yes" to each question (*id.*). The pain questionnaire completed by Dr. Fisher reflects his opinion that Plaintiff experienced mostly "moderate" restrictions (Tr. 447–48), with some exceptions. For example, he opined that Plaintiff "often" or "frequent[ly]" had deficiencies in concentration, persistence, or pace; had "marked" episodes of deterioration or decompensation; and a "marked" inability to perform repetitive tasks (*id.*). According to Dr. Fisher, the earliest date that the same level of severity existed was February 22, 2001 (Tr. 448).

VI.  VOCATIONAL EXPERT'S TESTIMONY

At the administrative hearing the ALJ posed a hypothetical question to the VE which assumed an individual of Plaintiff's age, education, and vocational history who had the limitations identified by Dr. Chen. The VE responded that such a person could not perform Plaintiff's past relevant work but that, given the restrictions, the individual could perform a limited range of unskilled light work, including outside deliverer, electrical accessories assembler, and mail clerk (Tr. 540). When asked if the limitations identified by Dr. Lucey would preclude the individual from performing any of the jobs identified, the VE indicated that they would not, noting that the limitations were similar to those suggested by Dr. Chen (Tr. 541).

Plaintiff's representative then asked the VE to assume the restrictions identified by Dr. Fisher. After noting these exertional and non-exertional restrictions, the VE testified that "given the totality of those limitations, no, there would not be work that exists, either regionally or nationally, that [Plaintiff] would be able to perform" (Tr. 542).

VII.  DISCUSSION

Seeking remand of this matter for further administrative proceedings, Plaintiff raises the following two issues in the instant appeal: (1) "the ALJ improperly rejected the Plaintiff's treating

physician's opinions"; and (2) "the ALJ had a duty to recontact [Plaintiff's] independent medical examiner, Dr. Fisher" (Doc. 10 at 4, 6).

1.  Rejection of Treating Physician's Opinion

The ALJ gave no weight to Dr. Fisher's assessments, concluding Dr. Fisher's "assertion that the stated RFC limitations existed as of February 22, 2001, is not substantiated by any evidence." (Tr. 23). Plaintiff argues that the ALJ erred by rejecting Dr. Fisher's RFC assessment. According to Plaintiff, Dr. Fisher's opinions were due substantial weight and, in fact, should have been accorded at least as much weight as Dr. Chen's opinion. The opinions of Dr. Fisher were rejected by the ALJ, Plaintiff submits, on "conclusory grounds" and under the apparent misconception that Dr. Fisher did not perform a physical examination of Plaintiff in connection with his report (Doc. 10 at 5). The Commissioner responds that in assessing Plaintiff's RFC the ALJ properly considered the medical opinions and that the evidence of record as a whole reflects that Plaintiff could perform a limited range of light work during the relevant period.

Social Security Administration regulations provide that an ALJ may consider several factors when determining what weight, if any, to give to the opinion of an "acceptable medical source." These factors include the examining relationship, the treatment relationship, whether an opinion is adequately supported, whether an opinion is consistent with the record, and a physician's specialization. 20 C.F.R. § 404.1527(d). While the ALJ is entitled to discount or reject any medical opinion if the evidence supports a contrary finding, Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1986), he nevertheless must state with particularity the weight given different medical opinions and the reasons therefore. Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987). Under what is known as the "treating physician rule," the ALJ must accord substantial or considerable weight to the opinion, diagnosis, and medical evidence of a treating physician absent a showing of "good cause" to the contrary. Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) (citation omitted). The opinion of a consultative examining physician, however, is not owed the same level of deference. Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2). Where an ALJ articulates specific reasons for failing to accord the opinion of a treating or examining

physician controlling weight and those reasons are supported by substantial evidence, there is no reversible error. Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005).

In this case, although Plaintiff cites the treating physician rule in his memorandum, in fact Dr. Fisher was not one of his treating physicians. Rather, as Plaintiff's counsel acknowledged at the administrative hearing,[8] Dr. Fisher only examined Plaintiff on consultative basis. Therefore, to the extent Plaintiff relies on the "treating physician rule" in asserting that Dr. Fisher's assessments were entitled to substantial weight, his reliance is misplaced. *See* Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986) ("We are unable to accept the application of "the treating physician rule" in this case because Dr. Tripp saw Mrs. Gibson only one time."). Furthermore, the ALJ was entitled to reject Dr. Fisher's assessments because, as the ALJ explained, the record as a whole does not support his conclusions. Sryock, 764 F.2d at 835.

First, even if, as Plaintiff represents, Dr. Fisher performed a physical examination in connection with the preparation of his assessments, Plaintiff does not assert that Dr. Fisher in fact made such notes and the record contains none; indeed, the record contains no diagnostic findings from Dr. Fisher or any other reasoned basis for his conclusions. Thus, as the ALJ noted, Dr. Fisher's assessments are "unsupported by any treatment or examination history . . . ." (Tr. 23). *See* 20 C.F.R. § 404.1527(d)(3) (noting that "[t]he more a medical sources presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). Regardless, as the ALJ also noted, Dr. Fisher's assessments are not consistent with the other evidence, including the medical records of Plaintiff's treating and other examining physicians. *See* 20 C.F.R. § 404.1527(d)(4) (noting that "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion"). More specifically, as outlined above, the records of Dr. Miranne reflect that Plaintiff's cervical condition improved significantly after his May 2001 surgery. Additionally, although Dr. Miranne's records reflect soreness of the lumbar spine, this symptom also was intermittent and, apparently, moderate in degree: a April 2002 entry

---

[8] According to statements made by Plaintiff's counsel at the hearing, Plaintiff sought the disability opinion of Dr. Fisher because "none of [Plaintiff's] treating physicians would fill out anything." (Tr. 522). Counsel further stated that Dr. Fisher's assessment was "based on records that we provided to him, and an examination. But he's not a treating physician." (*Id.*).

Case No. 3:09cv412/MCR/EMT

indicates that Plaintiff's lumbar spondylosis was not severe and he was capable of very light or sedentary work (Tr. 290); a September 2004 report states that Plaintiff's lumbar spondylitic radiculopathy was stable and "not severe at this point" (Tr. 276); and a January 2005 entry states that Plaintiff's lumbar spine condition was considered "not severe" (Tr. 275). Additionally, Dr. Miranne's answers in the April 2005 questionnaire (Tr. 274), do not implicate the level of severity identified by Dr. Fisher. Moreover, Dr. Shawa's physical examination report from June 2005 (Doc. 318), in which he found Plaintiff's lumbar spine was not tender to palpation, his reflexes were normal, his gait was normal (although he could not heel-walk), and his strength was normal (other than a slight reduction in the right foot), is not consistent with the limitations identified by Dr. Fisher in his August 2008 assessments. Dr. Samson's records—which commence nearly a year after Plaintiff's DLI—likewise are not consistent with Dr. Fisher's opinions. While Plaintiff reported knee pain to Dr. Samson, the medical record does not appear to contain any reference to knee problems prior to Plaintiff's DLI. Moreover, with respect to Plaintiff's complaints of neck and back pain, Dr. Samson's records indicate that in September 2008—which was nearly twenty-one months after Plaintiff's DLI—Plaintiff described his pain as intermittent and moderate (Tr. 454). The court is satisfied that the reasons articulated by the ALJ for refusing to give Dr. Fisher's assessments controlling weight are reasonably specific and are supported by substantial evidence. Moore, 405 F.3d at 1212. The ALJ's rejection of Dr. Fisher's opinions therefore should not be disturbed.

The ALJ elected to rely on Dr. Chen's September 2006 assessment, which the ALJ concluded was "well supported by [Dr. Chen's] own clinical examinations and testing . . . and is generally consistent with the record as a whole, including the conclusions of Dr. Miranne and Dr. Lucey." (Tr. 23). As the ALJ suggests, Dr. Chen's report indicates that he conducted a thorough physical examination. *See* 20 C.F.R. § 404.1527(d)(3). And, significantly, Dr. Chen's assessment of Plaintiff's medical conditions and limitations generally is consistent with the other medical evidence, including the reports of treating physician Dr. Miranne. *See* 20 C.F.R. § 404.1527(d)(4). Moreover, Dr. Chen's opinion regarding Plaintiff's RFC is similar to Dr. Lucey's, with both examining physicians opining that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk at least two hours in an eight-hour workday; could sit at least

four hours in an eight-hour workday; and had some postural limitations (Tr. 378–86; 433–35). Given that the record supports the reasons cited by the ALJ for accepting Dr. Chen's assessment of Plaintiff's functional limitations, the court perceives no reversible error

2. <u>Duty to Recontact Dr. Fisher</u>

Plaintiff argues that "[i]f the ALJ needed additional information to weigh Dr. Fisher's opinions, then the ALJ should have recontacted Dr. Fisher to obtain such additional information." (Doc. 10 at 6). Remand in this case is warranted, Plaintiff contends, because "the ALJ's failure to contact [] treating physician [Dr. Fisher] may have prejudiced [Plaintiff's] claim for benefits . . . ." (*Id.*). The Commissioner responds that the ALJ was not required to recontact Dr. Fisher for clarification of his opinions, having properly rejected them as being unsupported by Dr. Fisher's own examination notes or the rest of the evidence. Moreover, the Commissioner argues, the ALJ had ample evidence before him to evaluate Plaintiff's RFC.

It is well settled that "a hearing before an ALJ is not an adversarial proceeding" and that, whether or not the claimant is represented by counsel, "the ALJ has a basic obligation to develop a full and fair record." <u>Graham v. Apfel</u>, 129 F.3d 1420, 1422 (11th Cir. 1997). The ALJ is required to develop the claimant's complete medical history for at least the twelve months preceding the month in which the application was filed and to make every reasonable effort to help a claimant get medical reports from the claimant's own medical sources. *See* 20 C.F.R. § 404.1512(d). Medical sources should be recontacted when the evidence received from that source is inadequate to determine whether the claimant is disabled. *See* 20 C.F.R. § 404.1512(e). "In evaluating the necessity for a remand," courts should be "guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." <u>Brown v. Shalala</u>, 44 F.3d 931, 935 (11th Cir. 1995) (quotations omitted). The likelihood of unfair prejudice may arise if there is an evidentiary gap that "the claimant contends supports [his] allegations of disability." *Id.* at 936 n.9.

Section 404.1512(e)(1) specifically states that a medical source should be recontacted if the evidence received by the Commissioner from that source is "*inadequate* [to] determine whether [a claimant] is disabled." 20 C.F.R. § 404.1512(e) (emphasis added). In this case, Dr. Fisher's assessments were not inadequate to determine whether Plaintiff was disabled. Indeed, on the basis

of the information Dr. Fisher provided Plaintiff would have been found disabled (per the VE) if the ALJ has fully credited his opinions; thus, enough information existed from Dr. Fisher to reach a decision as to whether Plaintiff was disabled. The fact that the ALJ chose to reject Dr. Fisher's opinions did not trigger a duty to recontact him. *See* White v. Massanari, 271 F.3d 1256, 1261 (10th Cir. 2001) ("It is the inadequacy of the record, rather than the rejection of the treating physician's opinion, that triggers the duty to recontact that physician."); *see also* Clapp v. Astrue, Case No. 3:06cv334/MCR/EMT, 2008 WL 275880, at *14 (N.D. Fla. March 4, 2008). Moreover, the record did not otherwise warrant further development, given the treatment records from Drs. Miranne, Shawa and Samson, as well as the reports of Drs. Chen and Lucey. In light of the quantum of record evidence before him, the ALJ was well able to decide the case and no evidentiary gaps existed. Moreover, Plaintiff has not shown that he suffered prejudice as a result of any failure of the ALJ to perform further factfinding, because there is no evidence ALJ's decision would have changed in light of any additional information. Consequently, the ALJ did not err in failing to recontact Dr. Fisher.

VIII.  CONCLUSION

For the foregoing reasons, this court concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 16th day of July 2010.

> */s/ Elizabeth M. Timothy*
> **ELIZABETH M. TIMOTHY**
> **UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).